# In the United States District Court
## for the
## Western District of Texas

| | | |
|---|---|---|
| **ROBERT BLANCAS** | § | |
| | § | |
| **v.** | § | **Civil No. SA-08-CA-974-XR** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of the Social** | § | |
| **Security Administration** | § | |

## ORDER

On this date, the Court considered the Report and Recommendation filed by the Magistrate Judge, and Plaintiff's objections thereto, concerning Plaintiff's appeal of the Commissioner's decision to deny him Social Security disability benefits. After careful consideration, the Court does not accept the Magistrate Judge's recommendation to affirm the Commissioner's denial of benefits, and will remand the case.

## I. Introduction

Plaintiff Robert Blancas seeks review and reversal of the administrative denial of his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The main issue presented is whether Blancas meets the listing for mental retardation. Blancas asks the Court to reverse the decision and to render judgment in his favor. In the alternative, Barnes asks the Court to reverse the decision and remand the case for additional administrative proceedings.

## II. Jurisdiction

This Court has jurisdiction to review the Commissioner's final decision as

provided by 42 U.S.C. § 405(g).

### III. Procedural Background

Blancas fully exhausted his administrative remedies prior to filing this action in federal court. Blancas filed his first application for DIB and SSI benefits on October 25, 2005, alleging disability beginning October 14, 2005. The Social Security Administration ("SSA") denied the application initially and on reconsideration. Blancas then asked for a hearing, and a hearing was held before Administrative Law Judge Jonathan P. Blucher on August 1, 2007. The ALJ issued a decision on September 27, 2007, concluding that Blancas is not disabled within the meaning of the Social Security Act (the Act). In his decision, ALJ Blucher found that Plaintiff had the severe impairments of mental retardation, lumbar disc problems, right-sided weakness, and scoliosis, but found he did not meet a listing level impairment, and that he could do light and sedentary work, limited to simple jobs, including his past work. Blancas asked for review by the Appeals Council. Blancas then filed a second application for DIB and SSI.

On November 26, 2007, the SSA Appeals Council remanded for further evaluation of Blancas's cognitive functioning and his physical impairments. In its remand order, the Appeals Council stated:

> The record contains inconsistencies regarding the claimant's mental retardation and no current medical evidence regarding his musculoskeletal impairments. Mentally, the claimant is diagnosed with mental retardation; however, he had demonstrated the ability to successfully work at the substantial gainful activity level, irrespective of his cognitive test results. The examination at Exhibits R1-R7; however, indicates that the claimant has a significant deficiency in all areas of

2

> adaptive ability. Further evaluation is needed to assess the claimant's cognitive functioning. Physically, the claimant has not received treatment for his lumbar condition since December 2005. Updated treatment notes, if available, and further evaluation of his physical condition is needed to complete the administrative record.

Tr. 34.

The ALJ conducted a second hearing on April 28, 2008, and issued a second decision denying benefits on June 21, 2008. Blancas asked for review, but the Appeals Council concluded that no basis existed for review of the ALJ's decision. Tr. 3. The ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).

Plaintiff filed a motion to proceed in forma pauperis in this matter on December 3, 2008, and following the grant of that motion, he filed a complaint on December 12, 2008 against Commissioner of the Social Security Administration Michael J. Astrue, seeking to have the decision of the ALJ either reversed or remanded. Defendant filed an answer, and the case was referred to Magistrate Judge Nancy Nowak for a report and recommendation. Both parties filed briefs.

On December 8, 2009, Magistrate Judge Nowak issued a report and recommendation to this Court recommending the decision of the ALJ be affirmed. Plaintiff filed objections to the report and recommendation on December 16, 2009. Since the Report and Recommendation has been objected to, the Court reviews the Magistrate Judge's recommended disposition *de novo* pursuant to Federal Rule of Civil Procedure 72 and 28 U.S.C. § 636(b)(1).

# IV. Applicable Legal Standards

## A. Standard of Review

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed. *Martinez*, 64 F.3d at 173. In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (the court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner). Conflicts in the evidence and

credibility assessments are for the Commissioner and not for the courts to resolve. *Martinez*, 64 F.3d at 174. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.

## B. Entitlement to Benefits and Evaluation Process

Every individual who meets certain requirements, has filed an application for benefits, and is under a disability, is eligible to receive disability insurance benefits and/or supplemental security income benefits. 42 U.S.C. § 423(a)(1); § 1382(a)(1) & (2). The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

Regulations set forth by the Commissioner require disability claims to be

evaluated by the prescribed five-step process. 20 C.F.R. §§ 404.1520 and 416.920. A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.

The first step involves determining whether the claimant is currently engaged in substantial gainful activity. If so, the claimant will be found not disabled regardless of his medical condition or his age, education, or work experience. The second step involves determining whether the claimant's impairment is severe. If a claimant has no severe impairments, the claimant is deemed not disabled. In the third step, the ALJ compares the severe impairment with those on a list of specific impairments. Most of the listed mental disorders consist of a statement describing the disorder addressed by the listing, paragraph A criteria (a set of medical findings) and paragraph B criteria (a set of impairment-related functional criteria). There are additional functional criteria, paragraph C criteria, in some listings.

The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. C.F.R. Listing 12.00(A). Listing 12.05 employs four enumerated paragraphs instead of the typical three to describe the severity criteria, and only one paragraph must be met instead of a combination of two. However, these differences do not "relieve claimants of the initial burden of demonstrating that their impairment satisfies the introductory paragraph's diagnostic description." *Randall v. Astrue*, 570 F.3d 651, 659 (5th Cir. 2009). The introductory paragraph of Listing 12.05 requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."

If the impairment is not on the list, the ALJ, in the fourth step, reviews the claimant's residual functional capacity and the demands of his past work. If the claimant is still able to do his past work, the claimant is not disabled. If the claimant cannot perform his past work, the ALJ moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities, age, education, and work experience, to do other work. If the claimant cannot do other work, he will be found disabled. The claimant bears the burden of proof at the first four steps of the sequential analysis. Once the claimant has shown that he is unable to perform his previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account his exertional and nonexertional limitations, able to maintain for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002). If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that he is unable to perform the alternative work.

## V. Evidence

The ALJ held a hearing on April 29, 2008, at which Plaintiff appeared and testified, as did medical expert and psychiatrist (with a specialization in mental retardation) Barbara Felkins, M.D., and a vocational expert.

Plaintiff had three jobs prior to his alleged onset of disability. He worked at a

door manufacturer, removing doors from a machine, checking them for cracks, and then stacking them on a pallet. This was medium, unskilled work. He then worked as a janitor in a mall, where he picked up trash, swept, and mopped. Tr. 251. The vocational expert at the first hearing characterized this as medium, unskilled work, while the vocational expert at the second hearing characterized it as light, unskilled work. Blancas's most recent job was operating a shrinkwrap machine on an assembly line at a meat packing plant. Tr. 250.

Though Plaintiff was able to communicate well at the hearings, he did demonstrate some deficiencies. At both hearings, Plaintiff was able to give his address, but was unable to state his zip code or his wife's cell phone number. Tr. 252, 281. He could not remember the name of the cleaning company he had worked for.

Blancas testified that he washes the dishes once in a while, but his wife usually does "all of that." Tr. 252. He testified he does not do any cooking, laundry, or clothes folding. He testified he watches CSI and Grey's Anatomy, and goes to the movies with his wife. Tr. 253. He stated he does go to church, but does not have any local friends. Tr. 253. He testified that he has right side weakness since childhood, though he also confused his left and right sides. Tr. 258. At the first hearing, Plaintiff's attorney informed Judge Blucher that Plaintiff had been helping three hours a day, three days a week at the deli where his wife worked. He bused tables and did some cleaning, but not for pay, and could sit down and rest whenever he wanted to. Tr. 258. At the time of the second hearing, Plaintiff no longer had this "job."

## A. Mental Impairments

Plaintiff's school records show that he was labeled "educable mentally retarded" and was in special education classes throughout high school. He tested in the mildly mentally retarded range during his school years. It is undisputed that he received SSI as a child, which he stopped receiving around age 26 because he was working.

Cilla Stultz evaluated Plaintiff in June 2006. She administered the WAIS-III and obtained a full scale IQ score of 60, a verbal IQ score of 60, and a performance IQ score of 68, all of which were in the deficient range. Tr. 167. Plaintiff's general adaptive composite score was 60. Stultz stated that formal assessment "indicates that [Plaintiff's] adaptive ability to function in his environment is in the deficient range when compared to other individuals his age" and this "was noted in all assessed areas to include communication, community use, functional academics, home living, health and safety, leisure, self-care, self-direction, and social functioning." Tr. 167. In the "functional implications" section of her report, she noted that Plaintiff "demonstrates a significant deficiency in overall intellectual functioning (verbal and performance) as well as in all areas of adaptive ability." Tr. 170. She also concluded that, "[b]ased on the results of this assessment, [Plaintiff] demonstrates significant cognitive impairment and meets diagnostic criteria as an individual with mental retardation." *Id.*

Dr. Connolly examined Plaintiff in January 2008. Tr. 171-77. His report noted that: Plaintiff gets lost if he goes out without someone else; "[e]ven when [Plaintiff] was working he had to be working with someone because he could not work on his own"; he

isolates himself and has no friends; academic indicators show he has had very limited benefits from his educational experiences and his "practical intelligence is poor"; if his doctor gave him a prescription he would give it to his wife; if he swallowed poison by mistake, he did not know what he would do; his performance on the WAIS-III placed him in the "significantly subaverge" range of intellectual functioning, and these scores show limitations in cognitive ability that will restrict him in a variety of training and employment opportunities; expressive language skills, math concepts, concentration, immediate memory, fund of general knowledge and social judgment were very low; eye-hand coordination, spatial judgment and design and nonverbal reasoning were very low; the data were consistent with bilateral neurocognitive deficits; he had significant limitations in all academic areas (his grade equivalent for math was second grade, and first grade for reading and spelling); he has severe limitations in word recognition, expressive writing skills and math application skills that will restrict him in any vocational or work setting.

Dr. Connolly noted that, compared to Plaintiff's June 2006 test scores, several of the subtest scores were consistent, but the "similarities subtest score was inconsistent with past testing" and "some of the nonverbal subtest scores were somewhat higher today and his nonverbal scores appear to be in the Borderline range of intelligence." He noted that, in Stultz's report it was suggested Plaintiff could not write his own name, but Dr. Connolly noted that he could spell and read two, three, and four letter words that day. Dr. Connolly also noted that Plaintiff could perform only very simple mathematical procedures.

Dr. Connolly noted that Plaintiff was in special education classes as a young child, but noted that the school records were "quite varied." He stated that "[m]ost of his scores were in the Borderline range of intellectual functioning" and he "did appear to have spent most of his school years in Resource Classes." He then stated that "[w]hile most of his scores appear to be in the Mild Mental Retardation Range of intelligence, based on his clinical interview and his ability to give all of his own background information and the fact that he has been able to function independently in employment and in the community in the past, he appears to be functioning in the Borderline range of intelligence. He does however appear to have severe neurocognitive deficits."

Dr. Connolly included a "diagnostic impression" that included a GAF score of 48, meaning "serious difficulties in social and occupational functioning." His "functional assessment" noted that Plaintiff can take care of his own grooming, dressing, and hygiene, but he "does not pay bills, count change, does not go to the grocery store and does not go to the post office." "In terms of home management, he can use a simple microwave. They have color coded it for him. He does not cook on the stove. He can make a sandwich. He does not wash dishes or do laundry. He needs reminding to do chores and can follow simple instructions." "Interpersonally, he does not talk to friends. He just talks to neighbors and a few family members. He does not go to church." "During the day he watches television. He generally is not alone as his girlfriend is usually there. He watches the news. He listens to the radio and takes a one hour nap. He feeds himself." Dr. Conally further noted that Plaintiff does not

drive, use the bus, use a cell phone, or use a computer. Dr. Connolly also noted that he does not have the capacity to manage benefits in his own interest.

Dr. Felkins, the medical expert, noted that the two psychological tests administered by Connolly and Stultz were "very similar, basically," but Dr. Connolly chose to interpret them as borderline intellectual functioning based on Plaintiff's ability to do substantial gainful work activity for a long period of time, and Stultz chose to interpret it as mild mental retardation. Dr. Felkins stated that she "would agree with Dr. Connolly, that his actual functioning is more borderline intellectual functioning." Tr. 317. Dr. Felkins noted that Stultz measured Plaintiff's adaptive IQ at 60, but stated "his actual functioning is clearly above 60 in terms of his ability to do SGA" and "the reason you get these dueling consultative examinations is that he's a borderline case" such that "[t]he most conservative person will push him above, and more lenient person would push him below." Tr. 318. She also explained the discrepancies as due to possible brain damage from a stroke he suffered as a child, which could explain why some of his functionality seemed a little inconsistent or strange. Tr. 318. Dr. Felkins concluded that "he is right on the borderline and, and could be ... analyzed ... more conservatively or more liberally, one way or the other." With regard to his ability to work, the Dr. Felkins agreed that Plaintiff could do his job operating the shrinkwrap machine, but said that it was important to note that she did not "know how lenient his supervisor was or how much supervision he actually got in that job." She testified that his jobs would have to be repetitive in nature and very simple.

On questioning by Plaintiff's counsel, the Dr. Felkins agreed that Plaintiff's school records and test scores demonstrated mild mental retardation. Tr. 321. She also testified that schools generally "try as hard as they can not to label people mentally retarded" such that "[t]he fact that he has an EMR [educable mentally retarded] label is significant." Tr. 322. When asked if Plaintiff met 12.05C, the Dr. Felkins stated he was "awful close" and "right on the borderline there," though it is unclear whether she based that conclusion on his physical impairment. Tr. 324. When she was then asked "if there's a decision that his physical impairment is enough to prevent him from doing past work and be a serious impairment to other jobs, then does the psychological part here, added to that, meet the listing?", she answered "Yes." She agreed that it was a question of whether he meets the physical impairment part of the listing. Tr. 325.

The ALJ then asked Dr. Felkins, "Given the psychological test results, are you surprised that the Claimant worked successfully for eight full years until he hurt his back?" She answered "No" and explained that "It's possible, Judge, to get people right in that IQ range, where you can find a good slot for them to work, and they're able to do it. That's the whole point of the 12.05C. It's possible for some people with those borderline IQ's to find a, a spot that they fit and work there. But once they, you know, get a knee that doesn't work anymore, or something like that, then they can no longer do that kind of work. That's the whole point of the 12.05 C listing." Tr. 326. The ALJ then said, "[a]nd you understand he worked in three substantially different jobs successfully in that eight-year period?" To which she responded that "that's the whole point of the 12.05C, is that there are people who are borderline intellectually – who can

do certain things like janitor jobs or something, but once they – once you get, you know – knock them down to sedentary, then there's not – they can't do sedentary jobs." Tr. 326-27.

## B. Physical Impairments

Plaintiff asserts that he injured his back while working at the meat packing plant, though he also stated that the pain appeared during a coughing fit.[1] He saw Dr. Garcia at the Texas Med Clinic on October 6, 2005, for low back pain, and asked for a referral to a back specialist. Tr. 133. Plaintiff was referred to Dr. Jerjis Denno at the South Texas Spinal Clinic. Plaintiff saw Dr. Denno on October 14, and reported pain, including when sitting, bending, and lifting. Tr. 141. Denno found an absent Achilles reflex on the left and positive straight leg raising on the left. He had the impression of lumbar radiculopathy, and recommended conservative treatment (pain medication), with no work for a week or so, to see if the pain improved. Tr. 142.

Plaintiff had an MRI in November 2005, which showed disc desiccation at L4-L5 with bulging of the disc, a moderate to large-sized focal disc herniation along with central and left paracentral disc margin, disc dessication at L5-S1 with moderate sized broad-based midline disc protrusion, and findings consistent with an annular tear along the posterior disc margin near the midline. Tr. 139. Dr. Denno's notes from a December 12, 2005 follow-up visit indicate that he "has a diagnosis of a large herniated disc at L4-5 with lumbar radiculopathy "and "disc protrusion at L5-S1." Tr. 136. Dr.

---

[1] ALJ Blucher found Plaintiff to be less than fully credible, in part because he found Plaintiff's account of his injury to vary. However, Plaintiff's inconsistencies can be reconciled – he stated that he hurt himself at work, but did not feel it until after he got home, during his coughing fit. Tr. 254 ("I got hurt [at work], but I didn't feel it until after I got home.")

Denno recommended lumbar surgery, and recommended that Plaintiff not return to work as a machine operator. Tr. 136.

Plaintiff's physical RFC assessment, dated February 8, 2006, includes a primary diagnosis of herniated disc, and a secondary diagnosis of lumbar radiculopathy. Tr. 143. Dr. Denno submitted a follow-up report dated May 19, 2008, in which he stated that Plaintiff still had findings of radicular neuropathy, and felt Plaintiff was not "capable of any gainful employment and be able to sustain this over an 8hr workday." Tr. 216.

## VI. Analysis

### A. Findings and Conclusions of the ALJ

The ALJ issued his second report on June 21, 2008, finding that Plaintiff was not disabled.

The ALJ first found that Blancas had not engaged in substantial gainful activity since October 14, 2005, the alleged onset date. He noted that Blancas had stated at the prior hearing that he was working three hours a day at a deli where his wife worked, but that he had been recently terminated. The ALJ noted that Plaintiff's earnings record does not reflect any earnings during that time, that Plaintiff stated he was given food and money for his work, and concluded that "the time spent working at this job and the amount of remuneration received does not show that the job was performed at the substantial gainful activity level." Tr. 15. At step two, the ALJ found that Blancas had the following severe impairments: degenerative disc disease of the lumbar spine and borderline intellectual functioning. The ALJ noted that Blancas has a herniated disc at the L4-L5 level that restricts the amount of weight that he can lift and carry.

15

The ALJ further noted that "[a] consultative psychological evaluation found that claimant functions in the borderline range of intellectual functioning and the medical expert expressed the opinion that claimant is limited to simple, repetitive tasks." Tr. 16.

At step three, the ALJ found that Blancas did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including specifically listing 12.05 for mental retardation. The ALJ concluded that Blancas did not meet the criteria of the introductory paragraph – "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22" – because Blancas "does <u>not</u> have adaptive functioning deficits." Though the ALJ acknowledged that Blancas has an IQ in the range for the C criteria, which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function," the ALJ found that Blancas' "adaptive abilities are shown to be far higher than his IQ scores indicate."

In discussing the basis for his conclusion, the ALJ first noted that Plaintiff was in special education throughout school, cannot read and write English, though he can read some street signs and can labels, and has been on social security benefits since childhood on and off based on mental retardation, but these ceased when he went to work. The ALJ then noted that Blancas is married and lives in a house with his wife and that he had been working at the deli/convenience store where his wife works from

about 11 a.m. to 2 p.m. three days a week doing general cleaning, bussing tables, mopping, and sweeping floors. The ALJ further noted that Plaintiff testified that the owner of the deli picks him up and takes him to work and brings him back home, and that he goes to Sam's Club with the owner to buy things, puts them into carts, loads the packages into a van with another helper, and takes the goods to the back of the deli where he stacks them and takes some items to the front of the store. The ALJ acknowledged that Plaintiff later testified that another person does the actual stocking at the store because the goods are too heavy for him. Plaintiff also testified that the owner gave him a sandwich or groceries to take home or $2-3 but usually food, and that he had been doing this work for nine months. Plaintiff's wife recently lost her job at the deli, and Plaintiff stopped working there as well. The ALJ noted that Plaintiff did not lose this job because his work was inadequate.

The ALJ further noted that Blancas previously worked as a machine operator at a door factory for more than two years, and before that, he was a machine operator at a meat packing facility working at an assembly line operating a shrink wrapping machine. In between those jobs, he worked cleaning floors in the mall, sweeping, and picking up trash. The ALJ noted that these were competitive jobs in the national economy, not subsidized or accommodated work.

In reaching his conclusion that Plaintiff does not meet the Listing, the ALJ stated that Blancas "does not have adaptive functioning deficits." Tr. 17. The ALJ noted that Dr. Connolly, who tested Plaintiff in January 2008 and obtained a verbal IQ of 68, performance IQ of 74, and full scale IQ of 68, found that Plaintiff was functioning in the borderline range of intellectual functioning, not in the mental

retardation range. The ALJ discounted the opinions of Cilla Stultz, noting that even though she concluded that Plaintiff meets the diagnostic criteria for mental retardation, the conclusion was not supported by Plaintiff's work history and daily activities and was undermined by Dr. Connolly's findings that showed his overall cognitive potential is higher than his total measured IQ. The ALJ noted that Dr. Connolly's testing showed that Plaintiff could, among other things, give his date of birth, name three presidents in his lifetime, repeat words, and count backwards. The ALJ found that "claimant's adaptive abilities are shown to be far higher than his IQ scores indicate." Tr. 17. The ALJ further rejected the Stultz's testing results and report, which found that Plaintiff's adaptive ability to function in his environment is in the deficient range in all assessed areas, including communication, community use, functional academics, home living, health and safety, leisure, self-care, self-direction, and social functioning, becuase it is undisputed that Plaintiff worked for eight years, six of those at substantial gainful activity, and stopped work only when physically injured. The ALJ found Stultz's list of Plaintiff's alleged shortcomings to be "fantastic." Tr. 18. He concluded that Stultz was "seemingly oblivious to claimant's work history" and preferred "to accept her test results instead of claimant's actual long term life experience." Tr. 18. He noted that Blancas's work history is "highly suggestive of good adaptive functioning abilities (get to work on time; follow instructions; work at an adequate pace; get along with coworkers and supervisors)" and the "results obtained on testing for adapted behavior simply do not reflect the actual, factual adaptive functioning that the claimant has demonstrated." Tr. 19. The ALJ gave Stultz's report "little weight" because "claimant's abilities, while limited are far superior to that

18

suggested in the report."  Tr. 18.

The ALJ noted that "[t]he medical expert [Dr. Felkins] testified claimant met Listing 12.05C, yet the medical expert was not surprised claimant could work for eight years.  But it is claimant's history, not his test results, that are crucial here."  Tr. 19. Because "[a] finding of disabling impairments due to mental retardation does not rest entirely on test results of intellectual functioning [and] adaptive functioning is also part of the equation," and "claimant has repeatedly demonstrated in the real world quite high adaptive functioning despite his mental limitations," the ALJ found that Listing 12.05C was not met.

In determining Blancas's residual functional capacity, the ALJ found that Blancas has the RFC to lift/carry 20 pounds occasionally and 10 pounds frequently; walk/stand 6 hours in an 8-hour day and sit without limitation; occasionally bend, stoop, crouch, kneel, and crawl; is illiterate, but is able to speak English and Spanish reasonably well; and can do simple repetitive jobs.

At step four, the ALJ found that Blancas is capable of performing his past relevant work as a janitor or machine packer.  The ALJ also considered step five, and found that there are a significant number of jobs existing in the national economy that Blancas can perform, considering his age, education, work experience, and RFC, including lens inserter, eyeglass polisher, and assembler of eyeglass frames, and thus he is not disabled.

## B.  Plaintiff's Allegations of Error

The Plaintiff asserts that: (1) the ALJ erred in concluding that Plaintiff does not meet Listing 12.05C because (a) all of his conclusions are based on the

misunderstanding that no one who has ever worked can qualify for the Listing and (b) his finding that Blancas lacked deficits in adaptive functioning is not based on substantial evidence; and (2) "the ALJ's credibility choices, which led him to reject all medical and psychological reports except for the state agency non-examining assessment and also to reject the credibility of the claimant, is based on imaginary inconsistencies and speculation, rather than substantial evidence" and his finding that claimant could perform a limited range of light work is not based on substantial evidence.

**C.    Whether the ALJ's conclusion that Blancas does not meet Listing 12.05C is based on substantial evidence?**

The listing for 12.05C states:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

...

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

...

Here, the ALJ found that the C criteria were met, but also found that Blancas did not satisfy the diagnostic description because he does not have deficits in adaptive functioning.

In *Randall v. Astrue*, 570 F.3d 651 (5th Cir. 2009), the Fifth Circuit held that

20

Listing 12.05 requires "an independent showing of 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; that is to say, the evidence demonstrates or supports onset of the impairment before age 22."[2]  The Court cited with approval to the Tenth Circuit's decision in *Wall v. Astrue*, 561 F.3d 1048 (10th Cir. 2009), in which the Tenth Circuit held that "[a]n IQ between 60 and 70 'is insufficient, even with the presence of some impairment, to establish disability per se on the grounds of mental retardation"; "[r]ather, '[t]he key term in the introductory paragraph of section 12.05 of the regulation, so far as bears on this case, is "deficits in adaptive functioning.""" The Fifth Circuit expressly recognized that "under this construction of the regulation, some claimants may satisfy the specific severity criteria but not the general diagnostic description." *Randall*, 570 F.3d at 659 n.15.  Though the Fifth Circuit recognized the requirement that a claimant demonstrate deficits in adaptive functioning, it did not discuss what deficits were required or what methodology should or could be used to assess such deficits.

The Magistrate Judge applied the Fifth Circuit's decision in *Randall* in her report and recommendation.  The Magistrate Judge concluded that the ALJ's determination that Blancas failed to demonstrate deficits in adaptive functioning is supported by substantial evidence, particularly the report of the clinical

---

[2]  When Blancas first briefed this appeal in March 2009, he contended that the ALJ committed an error of law in requiring a separate showing of "deficits in adaptive functioning initially manifested during the developmental period" as listed in the introductory paragraph (also known as the "diagnostic description" or the "capsule definition").  However, as Blancas now acknowledges, that argument has been foreclosed by the Fifth Circuit's decision in *Randall*.

interview/mental status exam by Dr. Connolly. The Magistrate Judge concedes that the record also contains a diagnosis of mental retardation and lower IQ scores, "but a medical expert attributed the differences to this case being a borderline case." The Magistrate Judge noted that "[t]he medical expert agreed with Dr. Connolly that Blancas's actual functioning is 'more borderline intellectual functioning' despite having 'an IQ below 70.'" The Magistrate Judge rejected Blancas's claim that the ALJ ignored the medical expert's testimony, concluding instead that "the ALJ's opinion reflects consideration of all the medical expert's testimony."

In his objections, Blancas claims that he meets the criteria of Listing 12.05C, even under *Randall*, because the ALJ's conclusion that he lacked deficits in adaptive functioning is not based on substantial evidence. Plaintiff's main argument is that the ALJ concluded that Blancas failed to meet the listing primarily because he had been able to work in the past, which the ALJ found to negate a showing of deficits in adaptive functioning. Plaintiff contends that such heavy reliance on past work is in error, because Listing 12.05C expressly contemplates that the claimant may have engaged in past work. Plaintiff points to the introduction to section 12.00 for mental disorders, where it states:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. . . . For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the

additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," *even if you are unable to do your past work* because of the unique features of that work.

(Emphasis added.) Thus, Plaintiff persuasively argues that the fact that the claimant engaged in past work cannot be determinative of whether he satisfies the diagnostic definition of listing. *Durden v. Astrue*, 586 F. Supp. 2d 828, 837 (S.D. Tex. 2008) ("A person can meet the diagnostic description of mild mental retardation even though she has worked in the past."). Thus, we turn to what the diagnostic definition does require.

The diagnostic definition (sometimes referred to in the case law as the "capsule definition") for Listing 12.05 requires "significantly subaverage general intellectual functioning *with deficits in adaptive functioning*." It does not expressly define "deficits in adaptive functioning" or specify the degree of deficit required. "Adaptive activities" are described elsewhere in the Listing in relation to the severity assessment for activities of daily living as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." C.F.R. Listing 12.00(C)(1). In an unpublished opinion, the Fifth Circuit referred to this description when concluding that substantial evidence supported the determination that a claimant did not have deficits in adaptive functioning. *Arce v. Barnhart*, 185 Fed. App'x 437 (5th Cir. 2006) (citing See 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(1) and also citing *Morris v. Dretke*, 413 F.3d 484, 487 (5th Cir.2005) (quoting the lists of adaptive skills used by the American Association on Mental Retardation and American Psychiatric Association, which largely comport with the list provided in § 12(C)(1))).

The Sixth Circuit has held that the adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills. *Hayes v. Astrue*, 2009 WL 4906909 (6th Cir. Dec. 19, 2009) (citing *Heller v. Doe*, 509 U.S. 312, 329 (1993)). The Magistrate Judge noted the Seventh Circuit's description of "deficits in adaptive functioning," which described them as an "inability to cope with the challenges of ordinary everyday life" and "[i]f you cannot cope with those challenges, you are not going to be able to hold down a full-time job." MNR at 12 (quoting *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007)).

Further, as noted, though the Listing requires "deficits" in adaptive functioning, it does not specify what degree of deficit is required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning. *See Barnes v. Barnhart*, 116 Fed. App'x 934, 939 (10th Cir. 2004) (noting that, though the SSA added the requirements of the capsule definition to a finding of mental retardation, it "did not specify what the method and standards of assessment were for this added burden"). The Court agrees with Plaintiff, however, that the deficits necessary to satisfy the diagnostic description would appear to be less than the severity criteria of Listing 12.05D, which requires "marked" restriction of activities of daily living and social functioning.

The Sixth Circuit has held that, in evaluating a claimant in terms of Listing 12.05, we may consider the standards used by the leading professional organizations:

> To determine the definition of mental retardation under the SSA, it is appropriate to consult leading professional organizations' definitions. *See* 67 Fed.Reg. 20022 (2002). The American Psychiatric Association defines

> adaptive-skills limitations as "[c]oncurrent deficits or impairments ... in
> at least two of the following areas: communication, self-care, home living,
> social/interpersonal skills, use of community resources, self-direction,
> functional academic skills, work, leisure, health, and safety." DSM-IV-TR
> at 49.

*Hayes*, 2009 WL at *5. The Eighth Circuit has also referenced the DSM-IV standard

for evaluating mental retardation, but it expressly noted that the medical standard for

mental retardation is not identical to the legal standard. *Cox v. Astrue*, 495 F.3d 614,

618 & n.4 (8th Cir. 2007). In fact, it has noted that "[i]n revising the Listings of

Impairments in 2002, the Commissioner rejected a proposal that the DSM's definition

be used for Listing 12.05. See 67 Fed.Reg. 20,022." *Maresh v. Barnhart*, 438 F.3d 897,

899 (8th Cir. 2006). The SSA made the following statement at 67 Fed. Reg. at 20,022

regarding the applicable standard:

> Comment: One commenter recommended that we use the definition of
> mental retardation (MR) found in the Diagnostic and Statistical Manual
> of Mental Disorders (4th ed. 1994) (DSM-IV), published by the American
> Psychiatric Association, as the definition of MR in listing 12.05 and
> 112.05.

> Response: We did not adopt the comment. *The definition of MR we use in
> our listings is consistent with, if not identical to, the definitions of MR
> used by the leading professional organizations.* The four major
> professional organizations in the United States that deal with MR have
> each established their own definition of MR. While all the definitions
> require significant deficits in intellectual functioning, as evidenced by IQ
> scores of approximately 70 or below, age of onset and *the method of
> measuring the required deficits in adaptive functioning differ among the
> organizations.*

> For example, the definition of MR used in the DSM-IV is predominantly
> based on (but not identical to) the revised definition of MR promulgated
> by the American Association on Mental Retardation (AAMR) in 1993. The
> DSM-IV states: "The essential feature of mental retardation is
> significantly subaverage general intellectual functioning (further defined
> as an IQ standard score of approximately 70 or below), that is
> accompanied by significant limitations in at least two of the following

25

skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The onset must occur before age 18 years."

Following publication of this new definition of MR by the AAMR, the American Psychological Association published its own "Manual of Diagnosis and Professional Practice in Mental Retardation, 1996." It states: "Mental retardation refers to (a) significant limitations in general intellectual functioning; (b) significant limitations in adaptive functioning, which exist concurrently; and (c) onset of intellectual and adaptive limitations before the age of 22 years." In its definition, (a) is defined as "* * * an IQ or comparable normed score that is two or more standard deviations below the population mean for the measure;" and for (b), "* * * the criterion of significance is a summary index score that is two or more standard deviations below the mean * * *."

The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, *while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.*

Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed.Reg. 20018-01, at 20022 (April 24, 2002) (emphasis added.) The Tenth Circuit has relied on the last-quoted sentence to hold that the ALJs are required to "use any of the measurement methods recognized and endorsed by the professional organizations." *See Barnes v. Barnhart*, 116 Fed. App'x 934, 940 (10th Cir. 2004).

Though the Fifth Circuit has also recently held that deficits in adaptive functioning must be shown, it has not prescribed a specific measurement methodology. In *Arce v. Barnhart*, which is unpublished, the Court stated only the following:

A state medical consultant who examined Arce indicated that she did not have deficits in adaptive functions. On a checklist entitled "Adaptation," he indicated no significant limitations on her ability to respond appropriately to changes in the work setting, to be aware of normal

hazards and take appropriate precautions, and to set realistic goals and make plans independently of others. He indicated that her ability to travel in unfamiliar places or use public transportation was only moderately limited. On her supplemental questionnaire, Arce stated that she could do housecleaning and use a computer, that she did not need help grooming or communicating, and that she got along well with people when she worked. Although she also stated that she needed help cooking, paying bills, shopping, riding a bus and taking care of children, there is substantial evidence in the record that she does not have deficits in adaptive functioning.

*Arce*, 185 Fed. App'x at 438. In *Randall*, the Court held:

> After reviewing the record that was before the ALJ, we agree that her ultimate finding as to Randall's adaptive functioning was backed by substantial evidence. In particular, the ALJ was entitled to rely on the clinical psychologists' specific analysis of Randall's physical and mental capabilities, including the determination that she suffered from only "mild/borderline" adaptive retardation and that her impairments "would not preclude gainful competitive employment."

*Randall*, 570 F.3d at 654. In *Randall*, the clinical psychologist conducted a clinical interview and psychometric assessment, and "rendered the following findings: She could cook, clean, communicate, manage time, and travel independently; she was alert and responsive; and she possessed good receptive and expressive skills for everyday conversational purposes, good social skills, good abilities to attend and concentrate, good judgment and reflective cognition, and fair reasoning." *Id.* According to the psychologist, Randall "would function in the mild/borderline range of mental retardation adaptively," and "[o]n a day-to-day basis overall general functioning is felt to more closely approximate borderline mental retardation as opposed to mild mental retardation." *Id.* He concluded that Randall's physical and mental conditions "would not preclude gainful competitive employment though there may be some parametric restrictions placed on the type of employment she could engage in on an ongoing basis."

*Id.*

Looking outside the Fifth Circuit, it appears that, other than the Tenth Circuit, no circuit courts have specified a measurement methodology for evaluating a claimant's "deficits in adaptive functioning." The Eighth Circuit has affirmed when the ALJ relied on a consultative psychological evaluation that diagnosed the claimant with borderline intellectual functioning utilizing the DSM-IV criteria. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007). However, it recently reversed and remanded in *Douglas v. Astrue*, 341 Fed. App'x 257, 258-59 (8th Cir. 2009):

> We conclude that the additional evidence Douglas submitted undermines the ALJ's conclusion that Douglas had not shown the required deficiencies in adaptive functioning prior to age 22. *Cf. Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (claimant proved mental retardation manifested itself before age 22 when he struggled in special education classes through 9th grade and then dropped out of school). Although the ALJ rejected Douglas's low IQ scores as inconsistent with the record, we find that there is little in the record to contradict the scores. Specifically, while the ALJ found that Douglas's job as a "used car renovator" was semi-skilled work, Douglas's hearing testimony indicated that the work as he performed it-as a "gopher" who "ran errands" for his father-did not warrant a semi-skilled classification. Further, while the ALJ properly relied on evidence that Douglas drove, shopped, did household chores, prepared light meals, and was independent in all areas of personal care, the ALJ did not discuss the activities Douglas indicated he could not do: pay bills, use a checkbook, count change, do banking, or go to the post office.

In *Harris v. Commissioner*, Fed. App'x 813, 815-16 (11th Cir. 2009), the Eleventh Circuit required a diagnosis of mental retardation, and held:

> [Harris] was never diagnosed with mental retardation, only borderline intellectual functioning. The ALJ found that Harris did well in special education classes and was able to hold several jobs, which did not indicate the type of deficit in adaptive functioning required for mental retardation. Harris could dress and bathe himself, take care of his personal needs, and manage money. Likewise, Harris could read, communicate effectively, and do simple math. Thus, substantial evidence supports the ALJ's

finding Harris did not have the necessary deficits in adaptive functioning to meet Listing 12.05(C).

The Seventh Circuit referenced the DSM-IV in affirming a conclusion of no deficits in adaptive functioning:

> The key term in the introductory paragraph of section 12.05 of the regulation, so far as bears on this case, is "deficits in adaptive functioning." The term denotes inability to cope with the challenges of ordinary everyday life. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSMIV-TR) 42 (4th ed. 2000). If you cannot cope with those challenges, you are not going to be able to hold down a full-time job. In the case of Novy, however, the administrative law judge was on firm ground in finding that she can cope. She lives on her own, taking care of three children (possibly four-she definitely has four but the record is unclear whether more than three of them are living with her) without help, feeding herself and them, taking care of them sufficiently well that they have not been adjudged neglected and removed from her custody by the child-welfare authorities, paying her bills, avoiding eviction. Her intellectual limitations pose serious challenges to her ability to raise a family on her own. But she has overcome those challenges well enough that she should be able to hold down a full-time job-or so at least the administrative law judge was entitled to conclude without courting reversal.

*Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). In the cases finding that substantial evidence supported the ALJ's determination that the claimants did not have sufficient deficits in adaptive functioning, the claimants all had much higher functionality than the Plaintiff here. The lack of a clear standard for measuring deficits in adaptive functioning is not problematic in such clear-cut cases, but creates difficulties in borderline cases such as this one.

Here, Plaintiff has some deficits in adaptive functioning, was diagnosed with mental retardation as a child (and was even awarded SSI, presumably indicating that he satisfied the diagnostic definition until age 26), has a consultative examiner finding deficits in adaptive functioning, and has a medical expert concluding that he satisfies

the diagnostic definition. The ALJ relied primarily on Dr. Connolly's (another consultative examiner) conclusion that Plaintiff exhibited more borderline intellectual functioning, even though Dr. Connolly also noted functional deficiencies in that same report. The ALJ also noted that Plaintiff is married and lives in a house with his wife, does some household chores (washing dishes),[3] watches television shows that require some ability to follow plot and story line, and "has been able to navigate with fair success the daily challenges of communication, home living, and social functioning."

The ALJ noted that Dr. Connolly found "that claimant was able to give his date of birth and to name three presidents in his lifetime," "was able to repeat three words immediately and 2 of 3 after five minutes," "was able to count backwards from 20 to zero and to recite the alphabet," and could spell "cat" backwards.[4] The ALJ did recognize that Plaintiff "has problems with words consisting of more than four letters." But he also noted that Plaintiff "was found to [have] moderately good abstract reasoning skills and his Similarities Subtest score suggested that his overall cognitive

---

[3] The Court notes that Dr. Connolly's report states that Plaintiff did not wash dishes. Plaintiff stated at the hearing that he sometimes washed dishes, but that his wife primarily did those types of things. The Court also notes, however, that Plaintiff had previously worked as a janitor, and engaged in some cleaning tasks at the deli, and thus seems to be capable of simple "cleaning" tasks such as sweeping and mopping.

[4] The Court notes that these factors related to Plaintiff's concentration and memory abilities, and thus it is not clear whether or how much they are relevant to adaptive functioning. This further exemplifies the problems with the lack of a standard for identifying and measuring deficits in adaptive functioning. *See Durden v. Astrue*, 586 F. Supp. 2d 828, 834 (S.D. Tex. 2008) (noting that the regulations do not define deficits in adaptive functioning, but Listing 12.00 does provide criteria for assessing severity under section 12.05(D), including activities of daily living, social functioning, concentration, persistence, and pace, and episodes of decompensation, and that "[a]lthough it is not clear that the SSA intended these criteria to be synonymous with the term 'deficits in adaptive functioning,' some courts have considered these criteria when determining whether a claimant has the deficits in adaptive functioning required to meet Listing 12.05(C) because they overlap, to some extent, with the examples of adaptive functioning behaviors provided in the DSM-IV.").

potential is higher than his total measured IQ." Tr. 17. The ALJ further noted that Dr. Connolly's opinion shows "that claimant functions in the borderline range of intellectual functioning" and cited the Eighth Circuit's decision in *Cox v. Astrue*, 495 F.3d 614, 622 (8th Cir. 2007), which he summarized as holding that, "although the claimant had IQ scores similar to those here, the Court found that the ALJ could rely on the opinion of a consultative psychological examiner who, like Dr. Connolly, found that claimant's adaptive behavior appeared more consistent with borderline intellectual functioning than mental retardation."[5]

Concerning his rejection of Cilla Stultz's opinion, the ALJ noted that her assessment, which obtained a general adaptive composite of 60, indicated that Plaintiff's "adaptive ability to function in his environment is in the deficient range in all assessed areas to include communication, community use, functional academics, home living, health and safety, leisure, self-care, self-direction, and social functioning." The report also asserted that Plaintiff cannot state his address (the ALJ noted that he did at the hearing, though he did not know the zip code), dust furniture to a clean state, work independently (the ALJ noted that Plaintiff has "extensive work history"),

---

[5] In *Cox*, the Eighth Circuit concluded that, even though a medical report appeared to diagnose Cox with mental retardation, the report did not in fact intend to diagnose Cox with mental retardation, and the ALJ was entitled to rely on contradictory language indicating that her adaptive function was more in line with borderline functioning than mental retardation. The court found that the doctor's "remark indicating a contrary diagnosis of mild mental retardation was the result of inadvertence or imprecision." 495 F.3d at 618. Thus, *Cox* is distinguishable insofar as there was no diagnosis of mental retardation, only a diagnosis of borderline intellectual functioning. Further, the Court specifically noted that the medical doctor expressly found that "there did not appear to be limitations in two or more areas of adaptive behavior – a medical prerequisite for the mental retardation classification." *Id.* In this case, in contrast, Dr. Connolly did note limitations in his functional assessment, but did not indicate what criteria he ultimately used to conclude that Plaintiff has borderline intellectual functioning.

or work at one activity fifteen minutes at a time. The ALJ found these results inaccurate because they did not reflect "actual long term life experience." Further, he found them to be undermined by "the evaluation of Dr. Connolly, which was more extensive than that performed by Dr. Stutlz, and Dr. Connolly's opinion ... that claimant functions in the borderline range of intellectual functioning."

The ALJ noted that Plaintiff had worked for at least seven years at "competitive jobs," not subsidized or accommodated work. He emphasized that "[s]uch activity is highly suggestive of good adaptive functioning abilities (get to work on time; follow instructions; work at an adequate pace; get along with coworkers and supervisors)." He also noted that the vocational expert testified that Plaintiff's past work was at the SVP 2 skill level, not SVP 1, "which indicates the claimant was able to perform tasks that while unskilled are beyond the simplest jobs in the national economy." The ALJ found that Plaintiff's work history undermined Stultz's opinions regarding Plaintiff's limitations.

Based on all these facts, expressly mentioning Plaintiff's "work history and daily activities," Tr. 17, the ALJ concluded that Plaintiff's adaptive abilities are far higher than his IQ scores indicate, and thus he did not satisfy the capsule definition for mental retardation.

Though the ALJ did rely heavily on the fact that Plaintiff had worked in the past, evaluation of work and work attempts is highly relevant to the determination of disability. *Witt v. Barnhart*, 446 F. Supp. 2d 886, 895-96 (N.D. Ill. 2006) ("SSA regulations indicate that, in the context of mental retardation, an ability to hold a job is particularly useful in determining the individual's ability or inability to function in

a work setting.") (citing *Williams v. Sullivan*, 970 F.2d 1178, 1185 (3d Cir.1992) (citing 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(D)).  The Introduction to Section 12.00 states that "[i]nformation concerning your behavior during any attempt to work and the circumstances surrounding termination of your work effort are particularly useful in determining your ability or inability to function in a work setting" and "we should also examine the degree to which you require special supports (such as those provided through supported employment or transitional employment programs) in order to work."  A number of court decisions have relied on work history to evaluate adaptive functioning.  *See, e.g.*, *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) ("Foster's work as an accounting clerk at a bank and a liquor store clerk prior to injuring her leg demonstrate that she had the ability to perform relatively complicated tasks prior to the injury to her leg in 1992.").  However, those cases often involve at least semi-skilled work that is inconsistent with mental retardation.  *See Cooper v. Commissioner*, 217 Fed. App'x 450, 452 (6th Cir. 2007) (noting that claimant's ability to perform semi-skilled work for a number of years was "inconsistent with mental retardation"); *Carmack v. Barnhart*, 147 Fed. App'x 557, 560 (6th Cir. 2005) (noting that claimant's work history, including ownership of a tanning salon, "demonstrate[d] her ability to perform complex tasks" such as bookkeeping inconsistent with mental retardation).

Here, Plaintiff engaged in only unskilled work.  As noted by the district court in *Durden*, "[J]ust because a person may demonstrate an ability to perform unskilled work does not mean that they do not have deficits in adaptive functioning."  *Durden*, 586 F. Supp. 2d at 837.  Rather, the ability to work  at unskilled jobs, even independently, is consistent with mild mental retardation.  The DSM-IV expressly

notes:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. *During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.* With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV, at 42-43 (emphasis added). Here, Plaintiff performed unskilled work, and it is unclear how independently he performed his work. Even Dr. Connolly noted that Plaintiff could not work on his own and that he would have significant deficits in his ability to work due to his mental limitations.[6]

In the end, the Court finds that this is a very close case, and acknowledges that it is not the Court's role to reweigh the evidence. However, because Plaintiff's entitlement to benefits boils down to whether he meets the diagnostic description of listing 12.05, and there is no clear standard by which the ALJ made his determination of this issue, the Court finds that remand is required. The Court finds that this case is like *Barnes v. Barnhart*, where the ALJ appears to have utilized an ad hoc approach in determining that Plaintiff did not have deficits in adaptive functioning.

The ALJ appears to have focused more on what Plaintiff can do, failing to assess

---

[6] On remand, the ALJ and Plaintiff's attorney should fully develop the record with regard to the circumstances of Plaintiff's past work.

and recognize what Plaintiff cannot do.  Using the DSM-IV definition, Plaintiff could meet the definition with deficits in only two areas – it requires "*significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.*"  Though Stultz found deficits in all of these areas, it does not appear to be in real dispute that Plaintiff does not have deficits in self-care, health, or (perhaps) safety.  However, there is evidence that Plaintiff has at least some deficits in each of the other areas included in the DSM-IV's definition.  Even Dr. Connolly found deficits in his functional assessment.  The ALJ's broad statement that "[c]laimant does <u>not</u> have adaptive functioning deficits" simply cannot be sustained.[7]

For example, though Plaintiff appears to communicate orally without problem, it is undisputed that he cannot read or write beyond perhaps simple three-letter words.  Further, the inability to read and write and his inability to do anything other than simple math would appear to be a limitation in "functional academic skills."  This conclusion is supported by Plaintiff's diagnosis of "educable mental retardation," his enrollment in special education classes throughout his primary and secondary education, and Dr. Connolly's own assessment of poor practical intelligence and scores

---

[7] He may have meant that Plaintiff does not have *significant* adaptive functioning deficits, or "disabling" adaptive functioning deficits (as he states at Tr. 20), but it is again unclear what criteria are used to evaluate whether a deficit is significant or "disabling," assuming disabling is even a valid measurement. *Cf. Arguello v. Astrue*, 2008 WL 5330588 (D. Colo. Dec. 19, 2008) (noting that, even though the ALJ used the DSM-IV criteria to evaluate claimant's deficits, he did not state how he determined whether the deficits were significant, and noting that a medical expert would be required to determine whether the DSM-IV's criteria for significance would be met).

showing significant limitations in all academic areas. The Court further notes that, though Plaintiff has successfully worked, he does have limitations in his functional ability to work – Dr. Connolly himself noted that Plaintiff "has severe limitations in word recognition, expressive writing skills and math application skills that will restrict him in any vocational or work setting" and that his cognitive ability will restrict him in a variety of training and employment opportunities. Tr. 174-75. The record does not reflect whether a medical professional would find these to be "significant" deficits in the areas of communication, functional academic skills, and work.

Further, Plaintiff lives in a home, as the ALJ concluded, but the evidence indicates that he is rarely home alone and perhaps lives in a structured setting, minimizing the effects of his limitations. For example, it appears that the microwave and dvd are color-coded so that he can use them. The evidence indicated that Plaintiff could not otherwise cook or pay the bills. The Tenth Circuit, relying on the language of 12.00(F), held that "[t]he ALJ was supposed to have considered whether claimant's home setting was structured in a way that minimized the mental demands on her, and therefore her symptoms, and should have discussed the evidence showing that she had ability to function outside of that setting." *Barnes*, 116 Fed. App'x at 940 (quoting 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(F) ("we must consider your ability to function outside of such highly structured settings."). The record does not reflect whether a medical professional would find Plaintiff to have significant limitations in the area of "home living."[8]

---

[8] It is not clear what "home living" involves. The ALJ noted Plaintiff lives in a home and does some household chores (though Plaintiff only testified that he occasionally washes dishes). Surely more is required to demonstrate that one adequately functions in "home

The ALJ concluded that Plaintiff did not have any deficits in social functioning. However, Dr. Connolly noted that Plaintiff "isolates himself," "has no friends," "gets nervous easily," causing him to "leave the room or go to the bathroom" to "gather himself." Tr. 172. However, he has had a long-term girlfriend (sometimes characterized as a common-law wife), and appears to have adequate social functioning for work purposes (Dr. Connolly also noted that Plaintiff "has no difficulty getting along on the job"), as the ALJ noted. The record does not reflect whether a medical professional would find him to have significant limitations in social functioning.

Thus, as in *Barnes v. Barnhart*, "[t]he record in this case clearly shows that claimant has limitations in some of the areas the APA considers relevant, but whether they are 'significant' under the APA's standard (or meet the requirements of whichever standard the ALJ might decide to use) is unknown." *Barnes*, 116 F.3d at 942-43. Moreover, it is undisputed that Plaintiff was diagnosed as mentally retarded as a child (and thus before the age of 22) and had even been receiving social security benefits, presumably based on his mental retardation, and yet the ALJ gave this no weight, nor did he explain how circumstances have changed to render him no longer mentally retarded (other than the fact that he worked, but, as noted, engaging in unskilled work does not negate a finding of mild mental retardation).

The ALJ did refer to and consider some areas of adaptive functioning, and concluded that "claimant has repeatedly demonstrated in the real world quite high adaptive functioning despite his mental limitations." But the ALJ failed to adequately

---

living." This is yet another example of why the utilization of an ad hoc assessment methodology is problematic.

assess the noted deficits that Plaintiff clearly has. *See Durden v. Astrue*, 586 F. Supp. 2d 828, 836 (S.D. Tex. 2008) ("[T]here is no indication, at least from the definitions of adaptive functioning deficits of which this Court is aware, that adequate functioning in certain areas can somehow make up for deficits in other areas."). In addition, the ALJ failed to utilize the special technique, which requires him to assess Plaintiff's functional limitations in the areas of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. The special technique is used "to ensure that [the Commission obtains], consider[s], and properly evaluate[s] all the evidence" needed to evaluate impairments' severity in claims involving mental impairments. Utilizing this technique would have focused the ALJ on Plaintiff's functional limitations in the areas of daily living, the exact areas that the regulations have noted include adaptive activities. The regulations expressly state then, when evaluating adaptive activities, the ALJ should assess "the quality of these activities by their independence, appropriateness, effectiveness, and sustainability" and "will determine the extent to which [the claimant is] capable of initiating and participating in activities independent of supervision or direction." The ALJ did not do this, and if he had, he would have focused more on Plaintiff's actual deficits, as required for applying the diagnostic description. *See Durden*, 586 F. Supp. 2d at 840 ("performance of the Psychiatric Review Technique may well have helped orient the ALJ with regard to the Listing 12.05 requirements"). Under the circumstances, the failure to conduct the review was prejudicial. *Id.*

Further, the ALJ relied too heavily on Dr. Connolly's diagnosis of borderline intellectual functioning in light of Dr. Connolly's other findings concerning Plaintiff's

deficits, and fails to adequately explain his dismissal of the medical expert's testimony. Though Dr. Connolly concluded that Plaintiff was more consistent with borderline intellectual functioning, it is not clear what methodology he used in arriving at this conclusion. Further, some of Dr. Connolly's conclusions are not supported by his own report. As the ALJ noted, Dr. Connolly concluded that, while most of Plaintiff's scores "appear to be in the Mild Mental Retardation Range of intelligence, based on his clinical interview and his ability to give all of his own background information and the fact that he has been able to function independently in employment and in the community in the past, he appears to be functioning in the Borderline range of intelligence." It is not clear how Dr. Connolly arrived at the conclusion that Plaintiff had the "ability to function independently" in employment and in the community. Dr. Connolly noted that even when Plaintiff was working "he had to be working with someone because he could not work on his own," that he would get lost if he tried to go out without someone else, needs a color-coded microwave and dvd player to be able to use these appliances, and listed a range of Plaintiff's functional deficits, including that he does not pay bills, count change, go to the grocery store or post office, cook, do laundry, talk to friends, does not read, does not drive, ride the bus (presumably alone), or use a computer. Tr. 172, 176.

In contrast, the medical expert, who was a specialist in mental retardation and who had reviewed both Dr. Stultz's and Dr. Connolly's reports, testified that Plaintiff satisfied the diagnostic definition in the listing, even though she also stated she would agree with Dr. Connolly that "his actual functioning is more borderline intellectual functioning." Tr. 317. She testified that the school records indicate deficits in adaptive

39

functioning before age 22, noting that even Dr. Connolly interpreted those scores as mild mental retardation. Tr. 321. She stated that, if the C criteria were met, he would meet the listing. Tr. 325. The ALJ dismissed the medical expert's opinion by simply stating only that the medical expert was not surprised that Plaintiff had worked for years, ignoring her explanation that "the whole point" of 12.05C was to capture those who are borderline intellectually and could do simple jobs until they were injured. As noted, the fact that Plaintiff worked at such unskilled jobs is not inconsistent with a finding of mild mental retardation.

Thus, the Court finds that the ALJ, by utilizing an ad hoc assessment methodology, placed too much emphasis on Plaintiff's ability to work in concluding that Plaintiff did not have deficits in adaptive functioning, failed to perform the special technique, erroneously relied on Dr. Connolly's general diagnosis of borderline intellectual functioning, despite seemingly contradictory findings in his own report (including noting some deficits in adaptive functioning) and without obtaining clarification, and failed to adequately address the medical expert's testimony and conclusions that Plaintiff met the diagnostic definition.

**D.    Whether Plaintiff has a physical impairment imposing an additional and significant work-related limitation of function?**

The paragraph C criteria of Listing 12.05 require both a valid IQ score between 60 and 70 (this element is undisputed) and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." The regulations state that the Commission "will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your

physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." C.F.R. Listing 12.00(A). "If the additional impairment(s) does not cause limitations that are 'severe' as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes 'an additional and significant work-related limitation of function,' even if you are unable to do your past work because of the unique features of that work." *Id.*

The ALJ found that Plaintiff had the severe impairment of "degenerative disc disease of the lumbar spine"[9] and expressly stated that "claimant's lumbar spine impairment does impose additional and significant work-related limitations so with his IQ scores, claimant would seem to meet those parts of the listing." Tr. 17. Thus, if Plaintiff satisfies the diagnostic description, he would meet Listing 12.05C.

## E.    Remand Required

Based on the foregoing, the Court finds that remand is required. On remand, the ALJ should, at a minimum, (1) explain the standard by which he is assessing Plaintiff's deficits in adaptive functioning, (2) perform the special technique for mental impairments, (3) obtain clarification from Dr. Connolly regarding the standard of measurement he applied and the apparent inconsistencies in his report, (4) if necessary, obtain further evidence or evaluations of Plaintiff's adaptive functioning, and (5) give specific, supportable reasons for rejecting the medical expert's testimony (*i.e.*, the fact that Plaintiff could work is insufficient to reject a finding of mild mental

---

[9]    Plaintiff contends that the ALJ impermissibly substituted his own opinion in place of the medical doctors by concluding that Plaintiff has only degenerative disc disease, when all the medical evidence shows a herniated disc. See Tr. 136 (Dr. Denno), Tr. 143 (PRFC assessment), TR. 181 (Dr. Chavez). The Court does not reach this issue.

retardation).

## Conclusion

For the foregoing reasons, the recommendation of the Magistrate Judge is not accepted, and the case is remanded for further proceedings consistent with this opinion.

The Clerk is instructed to close this case.

It is so ORDERED.

SIGNED this 10th day of February, 2010.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE